GREAT LAKES DREDGE & DOCK CO. v.
UNITED STATES.

No. 45623.

Court of Claims.

Jan. 7, 1946.

Plaintiff's motion for a new trial is over-ruled, and the court on its own motion withdraws the former findings of fact, conclusion of law and opinion rendered on October 1, 1945, and the following findings of fact, conclusion of law and opinion are substituted therefor.

Special Findings of Fact.

1. Plaintiff is now, and at all times material herein was, a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business at 122 South Michigan Avenue, Chicago, Illinois.

2. On June 6, 1936, plaintiff entered into a contract with the War Department,

through the District Engineer, United States Engineer Office, Boston, Massachusetts, for performing certain dredging work in Cape Cod Canal, and in Hog Island Channel in Buzzards Bay, Massachusetts, including the dredging of a channel leading into Onset Bay, and the complete removal and disposal of piers of Old Buzzards Bay Railroad Bridge and the Old Bourne Highway Bridge. The work was described as Section B. The estimated yardage to be removed above the required depth was 4,135,700 cubic yards, and the maximum amount of allowable overdepth dredging was estimated at 807,200 cubic yards. The contract price for the removal of the common excavation was 34.25¢ per cubic yard, scow measurement.

3. Notice to proceed was received by plaintiff on June 29, 1936. Work was commenced by the plaintiff on July 1, 1936, and completed on August 16, 1938.

4. The specifications relating to the work to be done are:

"Par. 1-02. Work to be done: * * * The work to be done under these specifications consists of furnishing all plant, labor, and supplies, and the dredging and satisfactory disposal of all material encountered (see par. 4-01), except ledge rock, above the plane of 25 feet below mean low water from Station 37+00 to Station 70+00 and above the plane of 32 feet below mean low water from Station 70+00 to Station 490+00, Cape Cod Canal, Massachusetts, and above the plane of 17 feet below mean low water in the channel leading into Onset Bay. The work will also include the complete removal and disposal of bridge piers, * * *.

"The work to be done is shown on the maps and drawings described in paragraph 1-03. For contract purposes the work is divided into two sections, designated as Section 'A' and Section 'B.'

* * * * *

"Par. 1-03. Maps: The work shall conform to maps marked 'Cape Cod Canal, Massachusetts, Dredging Sta. 37+00 to 490+00, in 2 sheets, File No. 460/1-2 E-9-4'; 'Cape Cod Canal, Massachusetts, Dredging Sta. 37-490, Onset Channel, in 2 sheets, File No. 465/1-2 E-9-4'; 'Cape Cod Canal, Massachusetts, Dredging Sta. 37+00 to 490+00, Hog Island Channel, in 2 sheets, File No. 463/1-2 E-9-4'; and to drawings marked, 'Cape Cod Canal, Massachusetts, Dredging Sta. 37+00 to 490+00, Cross Sections, in 25

sheets, File No. 461/1-25 E-9-4'; 'Cape Cod Canal, Massachusetts, Dredging Sta. 37 to 490, Pier Removal, in one sheet, File No. 462 E-9-4'; and 'Cape Cod Canal, Massachusetts, Dredging Sta. 37+00 to 490+00, Onset Channel Cross Sections, in 1 sheet, File No. 464 E-9-4' which form a part of the specifications, and which are filed in the United States Engineer Office at Boston, Mass., and the U. S. Engineer Sub-Office, Buzzards Bay, Mass."

The plans showed permissible side slopes of one foot vertical to 2½ feet horizontal. Material removed up to these side slopes was to be paid for.

5. The specifications relating to payments and to deductions to be made for excess dredging are:

"1-07. Payments: * * * (g) So long as funds are available payments will be made monthly on estimates of such material as has been excavated and deposited in accordance with the specifications and not included in any prior estimate. * * *.

"1-08. Physical Data: * * * Owing to the rapid currents the material in the dredged cuts is eroded when it is disturbed by the process of dredging. During the progress of recent contracts the prescribed cuts have been secured by the contractor after the removal of about 75 percent of the estimated quantity of material in the cut, scow measurement, including overdepth. The quantities of materials given in the specifications, are the estimated pay yardages and are 75 percent of the estimated quantities, scow measurement, that must be removed from the cuts.

"2-01. Order of Work: * * * The location and limits of the work to be done will be plainly indicated by the contracting officer or his agents by stakes and ranges or otherwise, and gages will be established to show the stage of water with reference to the datum plane for dredging. * * *

"4-03. Overdepth and Side Slopes. To cover inaccuracies of the dredging process, material actually removed within the specific areas to be dredged to a depth of not more than 3 feet below the required depth will be estimated and paid for at full contract price.

"The contracting officer will prescribe the overcuts to be made to prevent the encroachment of material from the sides of the dredged cut, and material actually removed on his order from the prescribed

overcuts, whether dredged in original position, or after having fallen into the cut, will be estimated and paid for. Material taken from beyond the limits as extended in this paragraph will be deducted from the total amount dredged as excessive overdepth dredging or excessive side-slope dredging and will not be paid for.

"4–04. Method of Measurement: The material removed will be measured by the cubic yard in scows at the dredge by inspectors appointed by the contracting officer, but the contractor will be held responsible for its satisfactory disposal, and proper deductions will be made for all material that is not deposited according to the specifications. * * *

"Whether or not contract depth is being made will be determined by soundings or sweepings taken behind the dredge as the work progresses, and the contractor will be advised of the results. Should this survey disclose any excess of overdepth or side-slope dredging, the amount of such excess will be deducted from the monthly estimates.

"4–05. Equivalent Measurements: When necessary for any cause to convert 'scow measurement' into 'place measurement,' or the reverse, 115 yards of the former will be taken as the equivalent of 100 yards of the latter.

"4–07. Final Examination and Acceptance: As soon as possible after the completion of such sections established in paragraph 1–02 or subdivision thereof as in the opinion of the contracting officer will not be subject to injury by further operations under the contract, such area will be examined thoroughly by sounding and by sweeping, as deemed advisable by the contracting officer. Should any shoals, lumps, or other lack of contract depth be disclosed by this examination, the contractor will be required to remove them by dragging the bottom or by dredging, at the contract rate for dredging; but if the bottom is soft and the shoal areas are small and form no material obstruction to navigation, the removal of such shoal may be waived, in the discretion of the contracting officer. * * * When such sections established in paragraph 1–02 or subdivision thereof are found to be in a satisfactory condition, the work therein will be accepted finally. * * *

"Final acceptance will be subject to proper deductions or correction of deductions already made on account of excessive overdepth or excessive side-slope dredging (par. 4–03), and any such deductions or correction of deductions will be included in the next monthly estimates. Final acceptance of the whole or a part of the work and the deductions or corrections of deductions made thereon will not be reopened, after having once been made, except on evidence of collusion, fraud, or obvious error, and the acceptance of a completed section shall not change the time of payment of the retained percentages of the whole or any part of the work stated in paragraph 1–07."

6. On April 8, 1937, plaintiff in a letter to the contracting officer requested information on a deduction of 74,353 cubic yards of excess overdepth dredging made on payment voucher No. 10, and that it be furnished soundings on which the deduction was computed. By letter of April 14, 1937, the contracting officer advised plaintiff that this deduction covered the final overdepth and side-slope deductions in the Hog Island Channel between stations 444 and 490. He stated that under Par. 4–07 of the specifications that section of the work as well as the Onset Channel work was thereby finally accepted, and that no future work would be required in that area.

7. On June 8, 1937, plaintiff in a letter to the contracting officer returning the 12th payment voucher covering dredging during the period April 27 to May 26, 1937, requested information concerning an additional deduction of 72,974 cubic yards. Thereafter, the information requested was furnished.

8. On June 21, 1937, plaintiff by letter to the contracting officer made reference to its previous letters concerning deductions for excess overdepth dredging, and advised that it was preparing data in order to submit a claim for payment of the deductions made on estimates Nos. 10 and 12, and for another deduction which had been previously made on estimate No. 2.

9. On July 3, 1937, plaintiff in a letter to the contracting officer complained about deductions made up to that time which aggregated 205,404 cubic yards, 112,142 cubic yards of which covered excess side-slope dredging, and 93,262 cubic yards of excess overdepth dredging. In this letter plaintiff stated:

"In view of the wording of Paragraph 4–03 of the specifications entitled 'Overdepth and Side-slopes,' we are unable to understand the reason for the above deductions.

"In regard to side-slopes this paragraph reads as follows: * * *

"During all our contract operations in the Cape Cod Canal, including our present contract, the contracting officer has always set the limit lines and placed the ranges thereon, and we have dredged to these lines. On the present contract, at the start of the straightaway work at Station 485, on September 21, 1936, the limit range was set five feet inside the contract limit line. On or about November 15th, 1936, the limit ranges were moved to seven and one-half feet inside the contract limit line, and no dredging has been done beyond these lines.

"Inasmuch as the limit lines to which we are to dredge are established by the contracting officer, and as his representatives actually set these ranges in the field, we are entitled to payment for all material removed in connection with side slopes, whether dredged in original position or after having fallen into the cut, as stated in the specifications."

On October 14, 1937, the contracting officer replied to plaintiff's letters of April 8, June 8, June 21, and July 3, 1937, as follows:

"With regard to your protest against the side-slope deductions, you refer to paragraph 4–03 of the specifications, which reads as follows: * * *

"The purpose of this paragraph of the specifications is to enable the contracting officer to secure the project widths and depths of channel described in paragraph 1–02 of the specifications and depicted on the contract drawings by prescribing such overcuts as he may deem necessary to prevent encroachments of material from the sides of the dredged cut. Prescribing of overcuts under this paragraph by the contracting officer is not mandatory, and is left to the judgment of the contracting officer.

"The plans as issued, accepted by you in your bid and made a part of your contract, prescribe side slopes of 1 vertical to 2½ horizontal extended from the project depths. At no time has the contracting officer changed the side slopes shown on the contract drawings either as to slope or origin with respect to project depth, nor has he prescribed any overcut since the conditions did not warrant action under paragraph 4–03 of the specifications.

"To facilitate dredging in the Cape Cod Canal under your contract, on September 21, 1936, working ranges were set inside the contract limit lines. These ranges were first set five feet inside the contract limit lines, and on November 15, 1936, were moved to seven and one-half feet inside the contract limit lines.

"You will note that in establishing these ranges the contract limit lines were in no way changed; neither were overcuts prescribed. The allowable overdepths remained unchanged, as did the side slopes depicted on the contract drawings.

"The placing of the ranges on September 21, 1936, five feet inside the contract limit lines was based on the extension of the side slopes shown on the drawings in a downward direction until they intersected what was presumed would be the plane of your average depth (2 feet) of dredging below project depth.

"The location of the working range 5 feet inside of the contract limit line, on the assumption of a probable average overdepth of 2 feet, did not abrogate the allowable overdepth of 3 feet prescribed in the specifications, and your estimates have been computed and paid on the basis of full allowable overdepth.

"When it became apparent that you were dredging to obtain full allowable overdepth, it was deemed that your operations would best be facilitated by resetting the working range. This was done on November 15, 1936, by moving the range to a line 7½ feet inside the contract limit lines. As the basis for the revised position of the working range, the side slope shown on the drawings was projected downward until it intersected the plane of full allowable overdepth.

"A recheck of the quantities deducted for excess side slope dredging discloses that through error the deductions in Estimate No. 2 for work performed on the Onset Channel was based on side slopes of 1 on 2½ at the plane of allowable overdepth (—20 below mean low water) instead of side slopes of 1 on 2½ at the plane of project depth (—17 below mean low water) as prescribed in the contract drawings. Accordingly, further deduction for approximately 22,000 cubic yards at the contract unit price will be made on your next estimate for dredging quantities erroneously included in computing the payments due you for work performed on the Onset Channel. The above quantity is approximate and is subject to final check before the deduction is made. I shall be glad to give you access to the records and survey

data upon which this further deduction is based in order that you may check the accuracy of the computations.

"With reference to statement contained in your letter of July 3, 1937: 'that there is no specific limitation in the specifications as to the precise limits of side-slope payment nor is there mention made that this slope shall be computed from the contract grade line of 32 feet below M. L. W.,' you are advised that the drawings which form a part of the specifications and your contract clearly depict the precise limits of side-slope payment. You are, therefore, not entitled to payments for side slope as dredged as claimed. You are further advised that the side-slope deductions which you protest are in accordance with your contract and your claim that any deductions so far made for excess side-slope dredging should be voided and the amount of money deducted should be reinstated in a future estimate is denied.

"You are advised of your right to appeal from this decision as provided in Article 15 of your contract.

"A review of your letters protesting overdepth deductions discloses that you have established no basis for your claim asserted in your letter of July 3, 1937: 'that the excess overdepth dredging deduction should be voided and the amount of money should be reinstated in a future estimate.' It appears that your claim is summarized in your letter of July 3, 1937, in the statement that due to certain 'abnormal physical conditions at the Canal some tolerance should be allowed the contractor.' It is the opinion of this office that any tolerance beyond that prescribed in the specifications and contract plans, namely, 3 feet of overdepth and side slopes of one on two and half above the plane of project depth would not be proper or within the scope of the contract. Since the contract tolerances have clearly governed dredging operations under your contract and the payments made therefor, you are advised that your request that deductions so far made for excess overdepth dredging should be voided and the amount of money deducted should be reinstated in a future estimate is denied."

10. By letter of November 19, 1937, plaintiff appealed to the Chief of Engineers, United States Army, who was the duly authorized representative of the head of the department. The grounds of appeal and questions as passed upon are set forth in the ruling of the Chief of Engineers, dated February 11, 1938, as follows:

\*　　\*　　\*　　\*　　\*

"In support of your claim for reinstatement of 205,404 cubic yards of material at the contract price of $0.3425 per cubic yard, scow measurement, you contend substantially as follows:

"(a) That, inasmuch as the contracting officer established lines defining the limits of dredging on the sides of the channel, and placed the side-line markers, you are entitled to payment for all material removed in connection with side-slope dredging.

"(b) That the removal of material beyond the side slope limits is attributable to the erosive action of strong currents and waves created by the passage of large vessels. You contend that the alleged scouring action takes place between the time of dredging when the scows are measured for the estimates of yardage, and the time of the final soundings. You further state that such soundings are too long delayed.

"(c) That because of the presence of large boulders, embedded in the bottom, it is necessary, in their removal, to do considerable overdepth dredging.

"(d) That, since dredging has not been carried out to the limits of the authorized project, the excess removal of material will inure to the benefit of the United States.

"Paragraph 4-03, relating to overdepth and side slopes, provides as follows:

" 'To cover inaccuracies of the dredging process, material actually removed within the specific areas to be dredged to a depth of not more than 3 feet below the required depth will be estimated and paid for at full contract price.

" 'The contracting officer will prescribe the overcuts to be made to prevent encroachment of material from the sides of the dredged cut, and material actually removed on his order, from the prescribed overcuts, whether dredged in original position, or after having fallen into the cut, will be estimated and paid for. Material taken from beyond the limits as extended in this paragraph will be deducted from the total amount dredged as excessive overdepth dredging or excessive side slope dredging and will not be paid for.'

"Paragraph 4-07 of the specifications, relating to final examination and acceptance, provides in part:

" 'As soon as possible after the completion of such sections established in para-

graph 1–02 or subdivision thereof as in the opinion of the contracting officer will not be subject to injury by further operations under the contract, such area will be examined thoroughly by sounding and by sweeping, as deemed advisable by the contracting officer. * * * Final acceptance will be subject to proper deductions or correction of deductions already made on account of excessive overdepth or excessive side-slope dredging (par. 4–03), and any such deductions or correction of deductions will be included in the next monthly estimates. * * *'

"The questions at issue are—

"(a) Should deduction be made from scow measurement quantities for the material that the surveys provided for in paragraph 4–07 of the specifications disclose has been removed, either by the contractor or by scouring, from outside the slope lines indicated on the contract drawings?

"(b) Should deductions be made from scow measurement quantities for material removed, either by dredging or by scour, from below the 3-foot over-depth limit fixed in the specifications?

"With reference to (a) above, the facts are that in the Onset Channel, where the contract width is 100 feet, the side ranges were set so as to mark the margins of this 100-foot width. In the main canal, with a view to aiding you in restricting your operations to within the limits of the side slopes shown on the contract drawings, the side ranges in the early part of the work were set 5 feet channelward of the outer margin at project depth, this location being selected on the assumption that dredging below project depth would be about 2 feet. Later on, or about November 15, 1936, when it was fairly well established that the dredging would be carried to the full 3-foot allowance, the side ranges were set 7½ feet from the side line at the 32-foot depth.

"In determining pay quantities dredged in the Onset Channel, credit has been allowed for materials removed on the side slopes from above a line 3 feet vertically below the side slope lines indicated on the contract drawings. In the main canal no such overdepth on the side slopes has been allowed, deduction having been made for quantities removed from outside the side slopes indicated on the contract drawings.

"You contend in effect that the contracting officer is required by paragraph 4–03 of the specifications to prescribe overcuts that are to be made to prevent encroachment of material from the sides of the dredged cut and that this prescription relieves the contractor from any responsibility as to the behavior of such side slopes, and that, therefore, there should be no deductions for excessive side slope dredging. In the present case the contracting officer was not of the opinion that such a prescription was necessary in order to control the behavior of the side slopes and he did not prescribe specific overcuts. The only action taken by him in this connection was to establish ranges which if used as guides would apparently best enable you to conduct your dredging operations in order to provide the side slopes indicated on the contract drawings. The fact that no overcuts were prescribed appears to be prima facie evidence that it was not intended that payment would be made for such material as the surveys showed was removed from beyond the side slope lines indicated on the drawings. In fact, the ranges provided by the contracting officer, under the provisions of paragraph 2–01 of the specifications, to define the location and limits of the work to be done were intentionally placed to mark the line of intersection of the bottom overdepth plane and the side slope plane in the main canal and the intersection of the bottom and side slope overdepth planes in the Onset Channel. Your representatives on the work were fully aware of this situation. There certainly was no assumption by the United States of responsibility that the contractor's operations would be limited to the lines so set. Under these circumstances, I find no basis in the contract provisions in support of your appeal from the decision of the contracting officer with respect to side slope overdepth dredging and must conclude that computations of these non-pay quantities have been prepared on the correct interpretation of the specifications.

"With respect to question (b), there appears to be no basis on which it may be urged that payment should be made for material removed from below the bottom 3-foot overdepth plane. Paragraph 4–03 of the specifications is clear in providing that material removed to a depth of not more than 3 feet below the required depth will be estimated and paid for at full contract price. It may not be contended that this 3-foot overdepth may be indefinitely extended to include additional material intentionally or inadvertently dredged. I find

that your appeal in this respect is without merit, and it is denied.

"It must be recognized that the time at which surveys following dredging are made has an important influence on the extent of shoaling or overdepth dredging disclosed. You contend that such surveys were unduly delayed and refer specifically, as an instance, to the section between Stations 395 and 405. The record for this particular section indicates that the original dredging was completed January 5, 1937; the first redredging was completed February 19, 1937; a second redredging to remove two small shoals was completed April 29, 1937; and three additional small shoals were removed May 20, 1937. Soundings over this section were made January 6, January 20, February 2, February 9, and April 13 and 14, 1937; and these were followed respectively by sweep surveys on January 6, February 2, March 11 and 12, April 30, and May 20, 1937. The record further indicates that had the soundings of January 6 been used, deductions for excessive overdepth dredging would have amounted to about 3,000 cubic yards more than those computed from the sounding of April 13. It should be noted that the specifications do not provide for the acceptance of particular sections prior to completion of the entire contract work. However, it appears that the contracting officer has in fact accepted portions of the work that have been satisfactorily dredged to contract dimensions and has not thereafter held the contractor responsible for changes in conditions within these accepted portions. This, of course, operates to the advantage of the contractor. I conclude that surveys and sweeping operations have been conducted reasonably promptly after dredging and that there is no evidence indicating that your interests have been adversely affected by the schedule followed."

11. On December 22, 1938, about four months subsequent to completion of the contract, plaintiff renewed its protest to the contracting officer, claiming payment for all overdepth yardage deducted, summarizing its protest as follows:

"To sum up, we contend that the contract required the Contracting Officer to set points for overcut ranges, that the points set were believed to be set for that purpose, and that we were justified in so believing; that the formula used in deduction from the scow measurement gave deductions that were too great, and that no overdepth deductions from scow yardage should be made unless it is clear that the material removed in making the overdepth was placed in the scows and was measured for payment."

12. Under date of January 26, 1939, the contracting officer ruled on plaintiff's protest and denied plaintiff's claim.

On February 16, 1939, plaintiff appealed to the Chief of Engineers from the decision of the contracting officer.

On June 5, 1939, the Chief of Engineers denied plaintiff's appeal.

13. By letters dated July 24 and 25, 1939, to the Chief of Engineers, plaintiff reiterated the contentions made in its previous appeals, and requested reconsideration of decisions thereon. The Chief of Engineers responded by letter of September 28, 1939, stating that a conference had been arranged at the Office of the District Engineer, Boston, Massachusetts, for October 10, 1939. By letter of November 24, 1939, the Chief of Engineers wrote to plaintiff as follows:

"Reference is made to your letter of July 25 with accompanying brief dated July 24, setting forth your views regarding your pending claim against the United States under Contract No. W–175–eng–395 Cape Cod Canal, and to the conference on the subject matter between the representatives of this office and of your organization, held in Boston on October 10, 1939. In your letter and at the conference you requested further consideration of previous conclusions of this office emphasizing your contention that this office has erroneously interpreted the application of paragraph 4–03 of the specifications. This contention, repeated at various times during the conference, was stated at one time in the following words: 'I stand on the claim that this paragraph 4–03 is mandatory and insist that the contractor dredged to the stakes placed by the contracting officer, and that we haven't the slightest responsibility for a yard of what happens thereafter. * * * I do not think there should be a deduction of a single yard of the side slopes.' In support of this contention, you quote a paragraph from Finance Circular No. 144 dated August 6, 1937, issued by this office to its field representatives, as follows:

"'3. When subparagraph (a) is used, the United States assumes all responsibility for the side slopes, and deductions are made only if the contractor dredges outside of the limits prescribed by the contracting officer. This is the fairest procedure,

and is undoubtedly to the advantage of the United States in the long run, if the material removed can be properly measured. It can be measured when paid for by scow measurement. The standard specifications provide therefore that subparagraph (a) shall be used when the material is measured in scows.'

"It should be noted that the above circular was issued several months after work under your contract had been commenced and forms no part of the contract. It was issued to indicate to the field offices the policy expected to be followed in interpreting specifications, following the form of the standard dredging specifications, containing a paragraph similar to paragraph 4–03 of your contract. From the wording of the circular, it is evident that this policy could only be applied to such specifications in which no side slopes were specifically designated. It would not be applicable, therefore, to your contract, in which a side slope of one on two-and-one-half is indicated in the plan.

"Paragraph 4–03 of the specifications is quoted as follows: * * *

"Considering the language in paragraph 4–03 in relation to other paragraphs of the specifications, particularly paragraphs 2–01, 4–04, and 4–07, your contention that paragraph 4–03 is mandatory and that you have no responsibility for any material removed beyond the limits established is not sustained. Paragraph 2–01 states that the contracting officer or his agents will set the stakes or ranges indicating the location and limits of the work to be done. This was done in the present contract, and the location of the limit line, with reference to the stakes, was understood by all concerned. There is nothing in the language of paragraph 4–03 or any other paragraph of the specifications to reveal that the stakes themselves are to be considered more than ranges to indicate the limit of the cut, or that the contractor is relieved from any responsibility for exceeding such limits. Since a side slope has been indicated on the plans for this contract, no other side slope could be permitted or considered under the terms of the contract without written modification in the form of a change order given by the contracting officer. Since the limits of the cut were not extended under authority of paragraph 4–03, or otherwise, the dredging limits remained those established in the plans.

"It is to be conceded that in making a cut, the actual depth or area reached with the dredge will depend upon the nature of the materials and the effect of the scour. Paragraph 1–08 of the specifications put you on notice that during the progress of recent contracts the prescribed cuts have been secured by the contractor after the removal of about seventy-five percent of the estimated quantity of material in the cut. With this effect in mind, it cannot be conceded that you had any authority to actually reach the limits of the specified cut with every stroke of your dredging tool. On the other hand, where the limits of the cut have been exceeded, the methods of determining deductions are fully described in paragraphs 4–04 and 4–07 in the specifications.

"I must conclude that under the terms of the contract, it was your responsibility to so conduct your dredging operations that the resulting cut would be that called for in the plans.

"In view of the above, previous conclusions of this office to the effect that deductions have been properly made are reaffirmed, and I find that no further payments can be made under the terms of the contract."

14. By letter of February 14, 1940, plaintiff advised the contracting officer as follows:

"Reference is made to your letter of February 6, requesting the return of signed voucher forwarded from your office on August 8, 1939, as final payment under Contract W–175–eng–395, for dredging the Cape Cod Canal, Massachusetts.

"We do not, of course, agree with the findings of the Chief of Engineers, as set out in his letter of November 24, 1939, and, having availed ourselves of all the administrative procedure provided for, we have handed this matter to our attorneys, with instructions to pursue such other recourse as may be had.

"Upon the advice of counsel, we have declined, and continue to decline to accept the final payment as provided for in your voucher of August 8, 1939."

15. By letter of June 28, 1940, plaintiff submitted a claim for payment of 443,393 cubic yards of material at the contract rate of 34.25¢ per cubic yard amounting to $151,862.10. In this letter plaintiff set forth substantially the same contentions made in its previous letters to the contract-

ing officer and to the Chief of Engineers hereinbefore referred to. This claim was transmitted by the Chief of Engineers to the Comptroller General who, by certificate of settlement dated June 16, 1941, disallowed it.

16. The contracting officer deducted from payments to plaintiff a total of 258,005 cubic yards of excessive side-slope dredging, and 185,388 cubic yards of excessive overdepth dredging, or a total of 443,393 cubic yards, at the contract rate of 34.25¢ per cubic yard. Of this quantity 28,527 cubic yards of excessive overslope and 29,550 cubic yards of excessive side-slope dredging, or 58,077 cubic yards, pertained to the Onset Channel contract work, and the remainder 385,316 cubic yards to the Cape Cod Canal channel proper.

17. The quantities of material deducted for excessive overdepth and side-slope dredging were determined from surveys, or by place measurement, and converted to scow measurement, in the ratio provided for such purpose in paragraph 4-05 of the specifications, that is, 100 cubic yards place measurement being the equivalent of 115 cubic yards scow measurement.

The parties are in accord as to the quantity of material removed by plaintiff in scows at the dredge, and plaintiff does not dispute defendant's computation of the amount of excess overdepth and side-slope dredging, to wit, 443,393 cubic yards; however, plaintiff does contend that defendant's determination of the quantity of material to be deducted is in error, on the ground that defendant did not reduce the excess material by 25 percent under paragraph 1-08 of the specifications.

18. In the Cape Cod Canal and Hog Island Channel the area to be dredged was laid out by the Government engineers in 9 cuts, each 35 feet wide, numbered 1 to 9 from South to North, and marked by stakes and ranges, as required by paragraph 2-01. In the Onset Channel, the side ranges were set so as to mark the margins of the 100-foot width, while in the Canal and Hog Island Channel, the side ranges were set 5 feet inside or channelward of the outer contract limit line at the 32-foot depth, on September 21, 1936, and on November 15, 1936, they were moved to 7½ feet inside of the outer margin limits at the 32-foot depth.

19. Plaintiff commenced its operations under direction of the contracting officer at Onset Channel.

During the course of performing the contract work sweep surveys of the bottom of the canal were made pursuant to paragraph 4-04 of the specifications. The purpose of such surveys was to determine whether the required contract depth had been attained. Promptly after such surveys were made the results thereof were plotted on maps which were furnished plaintiff showing designated areas where redredging was necessary. These maps not only showed the exact location of the shoal areas but also the character of material causing the shoals. After redredging was performed, further sweep surveys were made. Defendant's survey parties were in constant touch with plaintiff's representatives, and they made sweep surveys with reasonable promptness after an area was dredged. No protest was made by plaintiff against any delay in making sweep surveys or against furnishing plaintiff with the results thereof.

20. During the early stages of dredging operations, deductions for excess dredging were based entirely on final surveys made under paragraph 4-07 of the specifications after a section was fully completed. Plaintiff objected to deductions on a final survey (a survey made after all initial cuts, as well as redredging, were completed). The objection was based on the ground that a great amount of erosion took place during the intervals between the time of intermediate surveys, which were made closely behind dredging portions of a section, and the time of final surveys which were made after a section was entirely completed, and that for this reason the final survey did not disclose accurately conditions as left by the dredge. As a result of plaintiff's objection, the method of basing deductions on final surveys only was changed three or four months after dredging was commenced. Survey parties were increased and more frequent sweep surveys of partially completed sections were made after dredging, in order to prevent deductions which might result from erosion occurring during the time of intermediate and final surveys in partially completed sections.

However, in areas where intermediate surveys were made and no dredging had been performed subsequent to the surveys which would subject the areas to any change the intermediate surveys were used as final and deductions were based thereon. In cases where initial dredging or redredging was performed after the intermediate surveys were made, a final survey

was made after the entire section was completed and used for making deductions. The result of surveys covering the entire contract width and depth of a given section were plotted on cross sections which were furnished to plaintiff. The effect of using the intermediate surveys as stated was to reduce the amount of deductions for excess dredging by avoiding deductions for any areas where material was not removed by the dredge. Many surveys which were made after various cuts were dredged, but before dredging was completed in the various sections, were made in addition to those shown on these cross sections. The surveys shown on the cross sections are those used for computing deductions.

21. The intermediate surveys provided for in paragraph 4–04 of the specifications were made as promptly after dredging as conditions warranted. Dredging operations in the canal proper involved, in general, nine 35-foot cuts. Cut No. 1 was made on the south bank of the canal and Cut No. 9 on the north bank. Plaintiff in its operations did not complete sections of a uniform length. However, wherever practicable, defendant made final surveys under paragraph 4–07 of sections ranging from 500 to 1,000 feet in length and these sections were finally accepted. The length of section offered for acceptance was dependent upon plaintiff's operations. In numerous instances plaintiff dredged single cuts, ranging from 2,000 feet to more than 4,000 feet in length, and generally, considerable periods of time would elapse between the first and final dredging. For instance, between stations 450 and 460 dredging was commenced on July 1, 1936, and the final dredging in that area was not completed until November 19, 1936; between stations 210 and 220 dredging was commenced on March 23, 1937 and the section was completed November 1, 1937; between March 19, 1937 and May 8, 1937, plaintiff dredged a single cut from station 205 to 225 (2,000 feet). Commencing April 2, 1938, the dredge operated between stations 230 and 268 (3,800 feet) without completing any section; between stations 220 and 230 the first dredging was performed in April 1937, and the final dredging on December 14, 1937; between stations 340 and 380 the first dredging was performed January 26, 1937, and the final dredging April 2, 1938. On some occasions single cuts as long as 4,400 feet were made without completing a section.

The proof is that if the contractor had uniformly dredged all 9 cuts in lengths, ranging from 500 to 1,000 feet, before proceeding to dredge in other areas, final surveys for deduction purposes could have been made more promptly after dredging. The intermediate surveys provided for in paragraph 4–04 of the specifications were made with reasonable promptness after plaintiff's dredging as warranted by the existing conditions.

22. At all times during the performance of the dredging work, there was a Government inspector on the dredge, one of his duties being to see that the dredge was kept on the ranges, and at the end of each forward move, consisting of 15 or 17 feet, the dredge was anchored or pinned up on spuds to keep it in place. In dredging the side cuts, the dredge was kept far enough inside of the area lines to permit of no substantial digging beyond the specified limit lines. It was kept as closely as possible to the 5- or 7½-foot range inside of the bottom limits as established by defendant's engineers. All of the material dredged and removed by plaintiff on the side slopes was dredged substantially within the limits indicated by the stakes and ranges.

23. Over the entire canal area embraced within plaintiff's contract the surveys used for making deductions for excess side-slope dredging were, with one exception, made prior to the time of completion of final redredging, but not with the frequency and not as closely behind the dredging operations as were the surveys on the bottom of the canal. The exception was in the section between stations 444 and 470. There the final dredging was completed November 19, 1936, and the final survey of the entire section was completed December 4, 1936. The evidence also shows that surveys on which deductions were computed for excess dredging on the bottom in the canal proper were, in some instances, made prior to the time of completion of final redredging. Further, that the surveys on which deductions were computed for excess dredging, both on the bottom and side slopes in the Onset Channel work, were made promptly after completion of final redredging. Except at the sections listed below, all surveys used for making deductions were made prior to completion of final redredging:

Between stations 220 and 230 the last dredging on the bottom was done on De-

cember 14, 1938. The final survey was made on December 16, 1938.

Between stations 250 and 260 the last dredging on the bottom was completed on July 20, 1938. The final survey was made on July 22, 1938.

Between stations 260 and 295 final dredging on the bottom was done on August 16, 1938, and the final survey was made August 19, 1938.

Between stations 295 and 340 the final dredging on the bottom was performed April 2, 1938, and the final bottom survey was made on April 4, 1938.

On the Onset Channel work the final dredging was completed August 17, 1936, and the final survey on which deductions were made was completed on August 19, 1936.

24. Plaintiff uniformly dredged to the maximum allowable overdepth dredging limits instead of confining its dredging operations to the required 17-foot and 32-foot depths.

Also, on many occasions the dredge dug considerably below 35 feet, to depths ranging from 37 to 39½ feet. As a result, plaintiff dredged on several occasions below the 35-foot level in the channel proper and below 20 feet in Onset Channel. Plaintiff's dredge operators consistently dredged to a depth of approximately 35 feet, the maximum allowable overdepth plane in the Canal work, instead of to the required 32-foot depth, and they consistently dredged to a depth of 20 feet while dredging in the Onset Channel instead of dredging to the required 17 feet. In dredging on the bottom when the dredge bucket approached the point where the 35-foot line intersected the side-slope line, the dredge continued to excavate to a depth of 35 feet close to the intersecting line, though not directly up to the line.

The maximum quantity of yardage estimated as being present in the 3-foot overdepth dredging area and available for removal was 807,200 cubic yards, scow measure. This yardage pertained to the bottom only. In making the estimate on which its bid was based, plaintiff estimated on receiving payment for the full amount of allowable overdepth dredging. Plaintiff actually removed and received payment for 656,023 cubic yards, or 81.3% of the available material.

25. Dredging to the maximum overdepth dredging limits was not necessary to provide the required 17-foot and 32-foot depths, but it was done voluntarily by plaintiff to increase the quantity of payyardage, and resulted in material overdepth dredging and erosion on the bottom of the canal.

26. Plaintiff in its dredging operations on the side-slope dredged within the limits of the range on the stakes fixed by defendant's engineers for its guidance, and within the contract limits, and it dredged immediately up to these limits. In carrying out this dredging, in addition to the material removed by the dredge, a large amount of material loosened by the dredge fell to the bottom. The dredging operation also caused a large amount of the loose sandy material to erode, much of it being carried away by the current and some being deposited on the bottom. All material on the bottom, within the contract area, both that falling from dredging and that deposited by erosion, was removed by plaintiff within the contract area to conform to the given measurements on the bottom of the canal.

At times surveys of the side slopes were not made promptly after dredging and the erosion was continuing with no survey until a survey could be made, which was no fault of plaintiff. Defendant had knowledge that erosion was considerable in the contract area during dredging operations. The proof shows that during one dredging operation an entire bank was observed to disappear by erosion in the current. Further, that when the submerged dipper left the bank the material would be high above the dipper but when the surface of the water was reached the material above the dipper had been washed away.

27. The first dredging performed under the contract was at Onset Channel. A deduction for excess dredging in Onset Channel was made in the estimate covering payments for the month of August 1936. No protest was made by plaintiff at the time this deduction was made. In computing the deduction for Onset Channel work, the defendant's resident engineer allowed payment for three feet excess dredging on the side slopes, on the ground that such an allowance had been made on other contract work. This allowance was made without the authority of the contracting officer. The contracting officer ruled shortly after this allowance was made that under the terms of the contract the pay limits on the slope extended to the contract side-slope line and that no payment would be made for material removed beyond those lines,

and he so informed the resident engineer. By letter dated October 14, 1937, plaintiff was advised by the contracting officer that he proposed to deduct 22,000 cubic yards of dredging which represented the excess dredging allowed on the side slopes of the Onset Channel. However, no such deduction was subsequently made. This work had already been finally accepted. Paragraph 4–07 of the specifications provides that final acceptance of a part of the work and deductions made thereon will not be reopened except for causes named which are not here material.

28. Plaintiff's contention that the excess areas for which deductions were made for excess overdepth dredging are chiefly areas resulting from erosion, and that the surveys on which the deductions were computed do not accurately show conditions as left by the dredge, is not supported by the evidence. There was erosion in the bottom but there is no proof showing what part, if any, of the areas outside the contract limits on the bottom of the canal for which excess dredging was deducted should be attributed to erosion, and the proof establishes that in areas where the defendant had determined that material was removed by erosion such areas were excluded in making deductions for excess dredging.

29. The proof is that both erosion and fill are continually taking place in the canal, principally during the process of dredging. The current in the canal is reversed every six hours, and the maximum current is about six miles per hour. Thus the velocity is sufficiently high to carry sand when placed in suspension. When sand is placed in suspension it moves back and forth, the direction depending on the tide in the canal. As a result, this velocity causes fill in some places and erosion in others. In some places where plaintiff had dredged beyond the pay limits, the excavated area would fill up when the tide changed. Likewise at other places erosion would occur. In order to determine what effect, if any, erosion would have on enlarging areas outside the contract limits, a study was made by the defendant in the area between stations 395 and 405. This study disclosed that in this particular area the excess areas were larger in volume by 500 cubic yards at the time dredging was discontinued than they were four months later because of fill which occurred after dredging was completed. In a study of the area between stations 447 and 457 surveys made before dredging and five months thereafter disclosed that in that particular area the excess areas were larger at the time dredging was completed than five months later because of material which was deposited by the current. The situation is not disclosed as to the other areas covered by plaintiff's contract.

30. Payment has been made to plaintiff for all material removed within the allowable overdepth dredging area, including both earth excavation and boulders. In addition, plaintiff has been paid at the contract rate of $12.50 per cubic yard for all boulders removed, whether or not the boulders came from within the contract area. There were removed from the entire contract area 4,563 boulders, involving 16,255.4 cubic yards.

The proof is not satisfactory to show what effect, if any, the boulders encountered, which were either removed or buried, had on the deductions made for excess dredging, and that it is impossible to even approximate the excess yardage involved in handling boulders. Boulders were buried only in cases where absolutely necessary; all boulders which were of such size as could be handled with the dredge were removed. Plaintiff's dredge Crest could remove without difficulty boulders ranging in size from 12 to 15 cubic yards. It was capable of removing boulders up to 22 cubic yards in size, but some difficulty was encountered in getting them into the dredge bucket. Over the entire contract area about 25 boulders were buried.

William S. Hammers, of Washington, D. C., for plaintiff.

Gaines V. Palmes, of Washington, D. C., and Francis M. Shea, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

WHITAKER, Judge.

Plaintiff sues to recover the sum of $151,862.11, the deductions made by defendant for 443,393 cubic yards of alleged excess overdepth and overslope dredging.

Plaintiff had a contract for performing certain dredging work in Cape Cod Canal and in Hog Island Channel in Buzzards Bay, Massachusetts, including the dredging of a channel leading into Onset Bay. Plaintiff was required to dredge the channel leading into Onset Bay to a depth of 17 feet over a bottom width of 100 feet. It was required to dredge a channel in the

Cape Cod Canal to a depth of 32 feet over a bottom width of 315 feet. To cover inaccuracies in the dredging process, an excess depth of 3 feet was allowed, for which payment was to be made. Payment was also to be made for all material removed from the sides up to a line running upward from the edge of the bottom of the cut on a slope of one foot vertical to 2½ feet horizontal.

After the work had been completed it was ascertained as a result of soundings and sweepings that 443,393 cubic yards had been removed beyond the allowable depths and sideslopes. Of this amount 258,005 cubic yards were deducted for excessive side-slope dredging and 185,388 cubic yards for excessive overdepth dredging. Of this quantity 28,527 cubic yards for excessive overdepth dredging and 29,550 cubic yards for excessive side-slope dredging pertained to the Onset Channel work. Payment for all this yardage, except that in the Onset Channel, having been refused, plaintiff brought this suit.

On page 132 of its brief plaintiff sets out its three propositions upon which it relies for relief. Summarized, they are as follows: (1) the failure of the contracting officer to prescribe the overcuts to be made to prevent the encroachment of material from the sides of the dredged cut; (2) defendant's failure to make sounding surveys behind the dredging as the work progressed to determine whether there was excessive overdepth or side-slope dredging; (3) its failure to reduce the quantity of excessive overdepth and side-slope dredging by 25 percent, to eliminate material removed by erosion.

It is not disputed that 258,005 cubic yards of material have been removed from the side-slopes more than the specifications called for, nor that 185,388 cubic yards have been removed from the bottom more than that called for by the specifications.

■ 1. Plaintiff says that some of the excess material on the bottom was removed by erosion and, therefore, it says, it was improper to make any deduction therefor. All deductions made were from material actually removed by plaintiff, as shown by scow measurements. The amount to be deducted was ascertained by surveys of the bottom and sides made as the work progressed or by intermediate surveys or by final surveys made after a particular sec-

tion of the work was completed. It is not disputed that these surveys showed that the stated amount of excess materials had been removed, whether by dredging or by erosion; and we are of the opinion that, even though some of it was removed by erosion, the deductions were properly made under the provisions of the specifications.

Section 4-04 provides for the measurement in the scows of the material removed and for soundings or sweepings to be taken "behind the dredge as the work progresses". This was for the primary purpose of determining whether or not the required depth had been reached; but if it should disclose also that there had been excessive side slope dredging or excessive dredging in the bottom, the specifications provided that deductions therefor were to be made from the monthly estimates. These soundings and sweepings, however, rarely, if ever, disclosed with accuracy the extent of the excessive overdepth or side-slope dredging, and deductions were not based upon them, but were based on intermediate or final surveys. Intermediate surveys were used where possible so as to eliminate deductions caused by later erosion; but where further dredging had to be done after the intermediate surveys, deductions were based upon the final surveys.

The use of the final surveys to determine the deductions in some instances was in accord with the provisions of paragraph 4-07 of the specifications. This reads:

"Final Examination and Acceptance: As soon as possible after the completion of such sections established in paragraph 1-02 or subdivision thereof as in the opinion of the contracting officer will not be subject to injury by further operations under the contract, such area will be examined thoroughly by sounding and by sweeping, as deemed advisable by the contracting officer.

\* \* \* \* \*

"Final acceptance will be subject to proper deductions or correction of deductions already made on account of excessive overdepth or excessive side-slope dredging (par. 4-03), and any such deductions or correction of deductions will be included in the next monthly estimates. \* \* \*"

■ Plaintiff complains that the soundings and sweepings were unduly delayed, but this complaint is not justified by the testimony. We are of opinion that the defendant made them as promptly as possible

in order to eliminate so far as it could deductions of materials removed by erosion.

Furthermore: Paragraph 1–02 of the specifications shows that what the defendant wanted was a depth of 32 feet in the Cape Cod Canal and a depth of 17 feet in the channel leading into Onset Bay. The provision for an allowable overdepth of 3 feet was only "to cover inaccuracies of the dredging process," and not because defendant wanted this depth, as is shown by paragraph 4–03 of the specifications. It was recognized that a contractor undertaking to get the desired depth of 32 feet would of necessity sometimes go beyond the 32 feet; so, the defendant agreed to pay him for the yardage removed beyond the 32-foot depth up to 3 feet beyond. But the findings show that the contractor did not try to limit his dredging to a 32-foot depth, but deliberately dredged to a depth of 35 feet throughout the channel, and on many occasions dredged to depth ranging from 37 to 39½ feet. This was in order to secure payment for the excess yardage. If plaintiff had followed the spirit of the contract and had not intentionally dredged below the depth of 32 feet, it is not unreasonable to assume that erosion would not have removed material below the 35-foot level, and no deduction would have been made from scow measurement for materials removed by erosion from below this level.

The contractor dredged to a depth of 35 feet notwithstanding the fact that it was put on notice by paragraph 1–08 of the specifications that experience under recent contracts had shown that about 25 per cent of the material required to be taken out had been removed by erosion, making it necessary for the contractor to remove by dredging only 75 percent of the materials which it was desired to remove.

Although defendant did not desire a depth of more than 32 feet, and although plaintiff deliberately dug to a depth of 35 feet, the defendant nevertheless paid it for all materials removed to the 35-foot level. The specifications in article 4–03 expressly say that materials removed from beyond this level will be deducted from the scow measurements "and will not be paid for."

2. Plaintiff's chief contention with respect to the excess materials removed from the side-slopes is based upon its assertion that the specifications required the contracting officer to provide for overcuts

to take care of the material which slid down into the bottom from the sides, and that under the specifications it was entitled to payment for the material removed from these overcuts. It is true that paragraph 4–03 of the specifications does provide that:

"The contracting officer will prescribe the overcuts to be made to prevent the encroachment of material from the sides of the dredged cut, and material actually removed on his order from the prescribed overcuts, whether dredged in original position, or after having fallen into the cut, will be estimated and paid for."

It is also true that the contracting officer did not prescribe any overcuts. Notwithstanding this, we do not think that plaintiff is entitled to recover for the excess material removed from the sides.

In the first place, the specifications in paragraph 4–03 expressly say, "Material taken from beyond the limits as extended in this paragraph will be deducted from the total amount dredged as *excessive over-depth dredging or excessive side-slope dredging* and will not be paid for." (Italics in original.) This means, of course, that materials taken from beyond the side-slope "pay line", however taken, whether by dredging or by erosion, will not be paid for. The defendant was willing to pay for all material removed up to a line of 1 on 2½, but if the plaintiff by its dredging operations or as a result of its dredging operations removed more materials than this, defendant expressly said it would not pay for it. Plaintiff knew that some material from beyond this line would probably be removed by erosion, and it is faced with the fact that the specifications expressly say that this material will not be paid for.

In the second place, paragraph 4–03 of the specifications does not make it mandatory upon the contracting officer to prescribe any particular overcut. He might have prescribed an overcut of 10 feet, of 5 feet, of 3 feet, of 1 foot, or 6 inches, or none at all, depending upon what he thought was necessary under the circumstances. In determining whether overcuts were necessary the contracting officer, no doubt, concluded, since plaintiff was consistently going to a depth of 35 feet, whereas the defendant desired only a depth of 32 feet, that such material

as would slide down from the banks would not fill up the bottom of the channel to a depth of less than the 32 feet desired by the defendant and, hence, it was not necessary to prescribe any overcuts.

But, whether or not this was the reason actuating the contracting officer in not prescribing any overcuts, nevertheless there was no duty cast upon him to prescribe any particular overcut and, therefore, plaintiff cannot say just how much of the deduction was due to the contracting officer's failure to prescribe overcuts. Even though paragraph 4–03 does make it mandatory upon the contracting officer to prescribe some overcut, plaintiff necessarily is unable to show how much of the deduction was due to his failure to prescribe any.

3. It seems plain from what we have already said that plaintiff's third contention, to wit, that the defendant made no allowance in making its deductions for the material removed by erosion, is without merit. Had plaintiff not deliberately dredged to the 35-foot "pay limit" and had it not dredged immediately up to the permissible side-slope, but had followed proper engineering practice and dredged only so close to the side-slopes as was necessary to remove all of the material required to be removed, whether by dredging or by erosion, and had it undertaken to obtain only a 32-foot depth, there might be some merit in plaintiff's contention; but there is none, we think, in view of the procedure deliberately followed by it.

4. Heretofore we have referred to the work done in the Cape Cod Canal. What we have said is equally applicable to the work in the channel to Onset Bay, except in one particular: In the Cape Cod Canal the representative of the contracting officer on the job set the range limits of the channel to be dredged, at first, 5 feet channelward from the edge of the required width. This was on the assumption that the average overdepth would be 2 feet, and, by setting the stakes at this point, the required side-slope would be obtained. Later, when he observed that plaintiff was dredging to the full allowable overdepth of 3 feet, he then set his stakes in 7½ feet from the edge of the required width. On the other hand, in the channel to the entrance of Onset Bay the contracting officer's representative set his stakes at the edge of the full 100-foot width required. Partly as a result of this, possibly, since it dredged up to the very limit of the ranges fixed, plaintiff dredged 3 feet beyond the required slope.

But, whether or not the placing of the stakes at the extreme limit of the width to be obtained was in any part responsible for this excessive dredging, plaintiff is not entitled to recover, because it has been paid for this excessive dredging. The contracting officer was of opinion that it was not entitled to be paid therefor, and proposed to make a deduction for the excess; but this deduction was never made.

We are of opinion that the deductions made were properly made and that plaintiff is not entitled to recover. Plaintiff's motion is overruled and its petition will be dismissed. It is so ordered.

WHALEY, Chief Justice, and LITTLE-TON, Judge, concur.

MADDEN and JONES, Judges, took no part in the decision of this case.